# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| NICHOLAS SHORT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 3:14-cv-02313 |
| | ) | Chief Judge Sharp |
| MICHEAL DONAHUE, | ) | |
| | ) | |
| Respondent. | ) | |

## M E M O R A N D U M

### I.    Introduction

Petitioner Nicholas Short, an inmate at the Hardeman County Correctional Facility in Whiteville, Tennessee, is serving a term of life imprisonment imposed by the Davidson County Criminal Court on June 18, 2010, for one count of first degree premeditated murder and one count of second degree murder.  Short has filed a *pro se* petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 challenging his conviction and sentence.  (Docket No. 1).

Presently pending before the court is the respondent's response to the *habeas* petition in which the respondent asks the court to dismiss the petition.  (Docket No. 28).  The petitioner has not responded.

The petition is ripe for review, and this court has jurisdiction.  28 U.S.C. § 2241(d).  Having fully considered the record, the court finds that an evidentiary hearing is not needed, and that the petitioner is not entitled to relief on any of his claims.  The petition therefore will be denied and this action dismissed.

## II.    Procedural History

In 2010, a Davidson County Criminal Court jury convicted Nicholas Short of first-degree premeditated murder and second-degree murder, and the trial court merged the convictions and sentenced the petitioner to life in prison. *State v. Short*, No. M2010-01914-CCA-R3-CD, 2012 WL 1593174 (Tenn. Crim. App. May 7, 2012), *perm. app. denied* (Tenn. Sept. 20, 2012). On May 7, 2012, the Tennessee Court of Criminal Appeals affirmed the trial court's judgment. *Id*. at *8. On September 20, 2012, the Tennessee Supreme Court denied discretionary review. *Id*. at *1.

Short filed a *pro se* petition for state post-conviction relief on September 23, 2013. (Docket No. 26-13 at 22).   Through counsel, he filed an amended state petition on January 3, 2014. (*Id*. at 59).   Following an evidentiary hearing, the post-conviction court denied the petition on March 6, 2014. (*Id*. at 63). The Tennessee Court of Criminal Appeals affirmed on April 22, 2015. *Short v. State*, No. M2014-00614-CCA-R3-PC, 2015 WL 1851943, at *7 (Tenn. Crim. App. Apr. 22, 2015), *perm. app. denied* (Tenn. July 20, 2015). On July 20, 2015, the Tennessee Supreme Court denied discretionary review. *Id.* at *1.

On December 1, 2014, the petitioner filed the instant petition for writ of *habeas corpus*. (Docket No. 1).   By order and memorandum entered on March 26, 2015, the court denied the petition and dismissed this action without prejudice to refile once the petitioner exhausted his state court remedies.  (Docket Nos. 14 and 15).

On September 10, 2015, the court granted the petitioner's motion to reopen the case after having exhausted his state court remedies and ordered the respondent to answer or otherwise respond to the petition by October 12, 2015. (Docket No. 21 at 2).  The respondent filed a response on October 9, 2015, urging the court to dismiss the petition.  (Docket No. 28).

In his petition, the petitioner asserts the following claims for relief: (1) the evidence is insufficient to support his convictions; (2) he received ineffective assistance from his trial counsel; and (3) his Confrontation Clause rights were violated when he was not allowed to cross-examine the medical examiner who performed the autopsy of the victim. (Docket No. 1 at 22-25).

## III. Summary of the Evidence

### A. Facts of the Offense

In its direct-appeal opinion affirming the trial court's judgments, the Tennessee Court of Criminal Appeals summarized the pertinent facts of the offense, convictions, and sentence as follows:[1]

> Short was indicted for one count of first degree premeditated murder and one count of first degree felony murder during the perpetration of an especially aggravated robbery. Both counts arose from the homicide of Tyrone Davis, the victim in this case. Short concedes that he fatally shot and killed the victim; however, Short insists that it was in self-defense. He explained at trial that the victim "rushed" him and, in an attempt to resist, Short began "shooting wildly" in the air. The State presented three witnesses who observed Short shoot the victim in the back to refute Short's claim of self-defense.
>
> Brandon Petty, a bail bondsman, testified that on December 9, 2008, he was working the area of Clarksville Pike and 26th Avenue in Nashville, Tennessee. He was driving his car and following his coworkers Tony Smith and David Fletcher, who were in another car. As Petty turned onto 26th Avenue, he heard gunshots. He looked into a nearby parking lot and saw two men struggling. He saw one of the men, the victim, on his knees and the other man, whom Petty later identified as Short, behind him. The victim looked like he was trying to get away. Petty testified that he saw Short shoot the victim in the back. Petty's car was facing Short, with the car's headlights pointed

---

[1] The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(e)(1).("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). The petitioner here does not contest the appellate court's statement of facts.

at Short's face. Petty clearly saw the two men, and nothing obstructed his view. Petty then saw the victim lying face down on the ground and Short bend over. Short pulled the victim's pants down and went through the pockets. Petty got out of his car, drew his weapon, and yelled at Short to drop his gun and to lie on the ground. Short turned, casually walked away, then dropped his coat at the corner of the nearby building and ran. Petty got back in his car and drove in front of Short. Tony Smith and David Fletcher, Petty's coworkers, chased Short on foot approximately 100 to 150 yards, at which point Short stopped. Short would not comply with their commands, and Smith shot Short with a taser. They placed handcuffs on Short and returned with him to the parking lot.

On cross-examination, Petty testified that although it had been raining earlier in the evening, it was not raining when these events occurred. It was dark at the time. The men were at first facing each other, but Petty did not see them "locked together."

The victim was "flailing trying to get away." Petty acknowledged that he did not know what happened between the two men before he heard the gunshots. He further acknowledged that he did not see the bullets actually strike the victim.

David Fletcher substantially confirmed the testimony of Petty regarding the events on the night of the offense. He specifically observed Short "standing there with his arm extended out and fire coming from the front of his arm." He also observed Short "maybe searching [the victim] or going through his pockets." On cross-examination, Fletcher conceded that he did not know what happened before he heard the gunshots.

Tony Smith testified consistently with the testimony of Petty and Fletcher. He also saw Short "standing over the [victim] firing rounds into the guy's back" in front of a strip mall. On cross-examination, Smith said that he did not know what happened before he heard gunshots. He saw Short bent over, but he did not see Short's hands in the victim's pockets.

Officer Matthew Grindstaff of the Metropolitan Nashville Police Department (MNPD) testified that he responded to the area of Clarksville Pike and 26th Avenue North. He saw two bonding agents with Short, who was handcuffed. The victim was not on the scene. Officer Grindstaff informed Short of his Miranda rights and arrested Short for the victim's murder. Grindstaff said that Short did not have

any visible cuts or scrapes on his face. He noticed that Short was wearing a pendant and large chain around his neck.

Investigator Lynette Mace with the MNPD identification unit testified that she processed the crime scene, collecting evidence and documenting its location. When she arrived at 7:17 p.m., it was raining, and water was flowing in the parking lot. She speculated that "nature" may have moved some of the evidence before she arrived. Investigator Mace found what appeared to be a blood stain on the parking lot surface, two projectiles fired from a bullet, eight fired shell casings, keys to the victim's car, a cell phone, a lighter, three hats, and a jacket with a gun in the right sleeve. The gun was empty and "in lock-back position," suggesting that it had been fired until empty of ammunition. Investigator Mace created a diagram documenting the locations of these items when she found them. The jacket was around the corner of the building from all the other items. The diagram and a number of photographs depicting the crime scene were admitted as evidence at trial.

Investigator Mace also went to General Hospital, where she photographed a silver Chevrolet. She found what appeared to be blood stains on the back seat and on a rear door handle. She retrieved the victim's clothing at the hospital and took it, along with the evidence found at the crime scene, to the lab. Another detective, Cody O'Quinn, also went to the emergency room and observed Michael Edmondson, a.k.a. Michael Jones, and Joe Don Bradley, a.k.a. "Joe Joe," [internal footnote omitted] standing near a silver Chevrolet "Capri" in the ambulance parking lot. Jones and Bradley were interviewed and provided identical accounts of what happened to the victim.

Rodrickous Hockett, whose nickname was "Meathead," testified that he was the victim's cousin. Hockett was in jail in December 2008, during the same period that Short was in jail. Hockett testified that he knew Short because Short was friends with Hockett's brothers and was frequently at Hockett's house when they were younger. Short told Hockett that he was arrested for shooting Hockett's cousin. Short said that Joe Don Bradley, or "Joe Joe," gave him the gun he used to kill the victim. Hockett also knew Bradley because Hockett "grew up with him."

MNPD Defective Robert Hanson testified that he interviewed Short after his arrest and treatment at the hospital for removal of the taser barbs. Short had no cuts on his face. Based on Detective Hanson's

familiarity with Short's voice, he listened to a number of telephone calls placed from the jail and recognized Short as one of the speakers. Portions of the telephone calls were played for the jury and admitted as evidence at trial along with transcripts of the calls. In the first call, which occurred on December 12, 2008, Short spoke with an unidentified male:

> SHORT: Little buddy's people I hit ... uh, Meathead gonna come holler at you about that you feel me?
>
> [....]
>
> MALE: Yeah, but why'd you hit dude up like that man?
>
> SHORT: Man, he fucked with [Joe Joe] man.
>
> MALE: Joe Joe know what's going on?
>
> SHORT: Don't ... act like ... man, I'm gonna handle it ... cause [Joe Joe] playing me all the way to the left. He playing everybody to the left like he don't know what's going on. [Joe Joe] the one who set it up Daddy.
>
> MALE: Alright man.
>
> SHORT: Don't say nothing to [Joe Joe] and them cause.... [....]

Doctor Sandra Thomas of the Davidson County Medical Examiner's Office testified that she reviewed the report and "body diagram" prepared by other doctors after they performed an autopsy on the victim. Doctor Thomas described three gunshot wounds that the victim suffered. "Gunshot wound B" was the result of a bullet entering the left side of the victim's back, over the shoulder blade area. The bullet traveled into the left lung cavity, between ribs, through the lung, and out through the front of the victim's chest in the area of the collar bone. This bullet traveled slightly upward through the victim's body. Another bullet caused "gunshot wound C" when it entered the victim's upper back "almost skim[ming] along the ... back." It traveled into the right lung cavity, fractured a rib, went through the lower lobe of the right lung and the diaphragm, and hit the liver, right adrenal gland, and the right kidney. Doctor Thomas

described the trajectory of the bullet as left to right, back to front, and downward. The bullet was recovered from the victim's body. "Gunshot wound D" occurred when a bullet entered the victim's lower back and traveled into the left lung cavity, through the lower left lung, and through the left side of the diaphragm. The trajectory of the bullet was right to left, back to front, and downward. This bullet was also recovered from the victim's body. None of the gunshot wounds exhibited fouling, the presence of soot on the skin, or stippling, abrasions or burns caused by ignited gun powder. Doctor Thomas testified that close range gunshot wounds usually exhibit fouling and stippling, but that a victim's clothing can prevent these characteristics.

According to Doctor Thomas, gunshot wound D would be consistent with the victim's being shot while on his knees by a person standing behind him. Gunshot wound C would be less consistent with this scenario due to the steep angle of travel, but Doctor Thomas testified that it would be consistent with the shooter standing above the victim.

In addition to these gunshot wounds, Doctor Thomas described several abrasions on the victim's body. There were abrasions on the right side of the forehead, the right side of the bridge of the nose, and the heel of the right hand. Doctor Thomas testified that these abrasions were consistent with the victim's falling on asphalt. The victim also had raw abrasions on both knees, consistent with the victim's crawling or walking on his bare knees on asphalt. Due to the fresh appearance of these abrasions, Doctor Thomas believed that they occurred very close to the time of death. Doctor Thomas testified that the victim's body did not exhibit black eyes or bruising on his hands that would be consistent with a fist fight. A diagram denoting the location of all the victim's wounds and a number of photographs depicting the wounds were displayed to the jury and admitted as exhibits at trial. The cause of the victim's death was determined to be multiple gunshot wounds, and the manner of death was homicide.

On cross-examination, Doctor Thomas testified that both of the bullets that caused gunshot wounds C and D traveled downward in the victim's body approximately one foot. Doctor Thomas acknowledged that bullets can change trajectory if they hit bone or other materials in the body. The bullet that caused gunshot wound B and traveled upward through the victim's body did not hit bone. Doctor Thomas testified that gunshot wounds C and D could be consistent with a scenario in which the shooter reached over the

victim's back and fired downward.

Special Agent Don Carman, a forensic scientist in the Tennessee Bureau of Investigation firearms identification unit, identified the pistol found at the crime scene as a Sig Sauer .45 caliber semiautomatic. He determined that the two bullets found at the crime scene and the two bullets retrieved from the victim's body were all fired from the pistol. He also determined that the eight casings found at the crime scene were fired by the pistol. He examined the victim's clothing and, based on the concentration of gun powder residue near the bullet holes, determined that the gun was not in direct contact with the victim when it was fired but that it was less than twenty-four inches away at the time.

On cross-examination, Agent Carman testified that the two bullets found at the crime scene had a symmetric, flattened shape, which was consistent with having been shot at a perpendicular angle into a hard surface such as asphalt.

Short testified in his own behalf that on the night of the offense, his friend Dejuan gave him a ride. Short was armed with a "four-five" gun that night, and he took the gun with him "when [he] [went] to places that [he was] not from." Dejuan and Short stopped at the store at Clarksville Pike and 26th Avenue North to look at clothes. While Dejuan was inside the store, Short stepped outside to smoke a cigarette. The victim, whom Short did not know and had never seen before, walked toward Short. The victim asked Short about his chain and medallion and inquired where he bought them. The victim held the medallion with one hand. Short drew his firearm and said to the victim, "[B]ack up, homeboy." The victim "rushed" Short. Short tried to back up, but the victim grabbed him in a "bear hug." Short, who had his right arm free, began "shooting wildly" over the victim's back.

Short testified that he was trying to hit the victim in the leg in the hope that the victim would let go. Both men fell to the ground, and Short continued shooting as they fell. Short said that his jacket was slipping off while the two were "tussling" and falling to the ground. Once they hit the ground, Short did not fire any more shots. Short realized he shot the victim when the victim did not rise from the ground. Short denied shooting the victim after he got up from the ground or while the victim was lying on the ground. When Short got up, he pulled up his pants, which had fallen down to around his knees, and bent over to put on a shoe that had come off. As he did so,

Short saw the armed "bounty hunters" and ran. He stopped in a driveway when he saw a police car nearby.

Short testified that he shot the victim because the victim rushed him after Short told the victim to back away. He feared that the victim would shoot him if the victim were to get the gun in the fight. Short explained that he emptied the gun because he continued shooting until they were loose of each other. He did not intend to kill the victim. Short denied going through the victim's pockets or attempting to rob the victim. Short testified that his mother had recently died, leaving him an inheritance, and he had no reason to rob the victim.

Short testified that his previous statement to the police was a lie. He told the police that he saw a gun in the victim's pocket, reached in the pocket, and began firing. Short testified that the victim did not have a gun. He explained that he lied because he realized he "was the one in the wrong" and was trying to craft a more favorable story for himself. Short testified that the victim was "just asking me about a chain," and he did not know if the victim was going to do anything to him.

Short denied being given the gun by Bradley or that they had pre-arranged the confrontation or murder. Short explained the jail telephone call in which he said that he shot the victim because the victim had done something to "Joe Joe":

> I was asked why did I shoot him and I started to say one thing, but ended up just saying down there fucking with [Joe Joe], like I was just down there fucking with [Joe Joe] and this all happened. Not because [the victim] messed with [Joe Joe] but me in general down there.

Short said that he realized he was wrong and was looking for someone to blame. He told different stories to shift the blame off himself.

Short testified that earned his nickname "Shooter," from "[s]hooting basketball all the time."

On cross-examination, Short acknowledged that he fired the pistol at least eight times and that he knew what would happen each time he pulled the trigger. He testified that he previously lied and told a detective that his nickname was not "Shooter" because "what [the

detective] was going to ask [Short] about and the nickname didn't go well together." He acknowledged that he shot an unarmed man. He said, "I just jumped to the wrong conclusion and I'm sorry."

Following the proof at trial, the jury convicted Short on count one of first degree premeditated murder and on count two of second degree murder, a lesser included offense of felony murder. The trial court merged the convictions and imposed a sentence of life imprisonment. This timely appeal followed.

## B.    Evidence Presented at the Post-Conviction Evidentiary Hearing

In affirming the denial of post-conviction relief, the Tennessee Court of Criminal Appeals summarized the post-conviction issues and evidence presented at petitioner's post-conviction evidentiary hearing as follows:

> Petitioner testified that he had "several complaints" against his trial counsel regarding trial counsel's alleged ineffective assistance. Petitioner testified that a juror worked with the victim's family. Petitioner told trial counsel that he "didn't feel comfortable with [that juror] being on the jury [,]" but trial counsel did not strike her from the jury. Petitioner testified that trial counsel failed to properly cross-examine the State's witnesses, Brandon Petty, Tony Smith, and David Fletcher. Petitioner testified that Brandon Petty made a prior inconsistent statement to the police, and trial counsel did not offer the prior statement as evidence. Petitioner testified that Mr. Petty, Mr. Smith, and Mr. Fletcher testified that they saw Petitioner go through the victim's pockets, but they later admitted that they could not see whether Petitioner's hands were in the victim's pockets. Petitioner testified that trial counsel "never did strike on that." Petitioner also testified that trial counsel should have objected to leading questions of those witnesses by the prosecutor.
>
> Petitioner testified that he requested that trial counsel seek a "mental evaluation" for Petitioner because at the time of his trial, "it was a troubling time in [Petitioner's] life" because his mother had died four months prior to charges being brought against Petitioner. Petitioner also testified that trial counsel was ineffective for failing to object to Detective Hanson's testimony regarding jail phone calls on the basis that the detective was "not an expert in that field of voice recognition." Petitioner testified that trial counsel also should have objected to Dr. Thomas' testimony on the basis that she did not

perform the victim's autopsy. Petitioner also felt that trial counsel should have recalled any eyewitnesses to testify after the gun expert testified to question the witnesses about the angle they saw Petitioner shoot the victim.

Petitioner testified that trial counsel did not discuss Petitioner's testimony with Petitioner or otherwise prepare Petitioner to testify at trial. Petitioner acknowledged, "what I gave a statement [to police] to and what I testified to was two different things." Petitioner testified, "like I said at trial, I can't see me looking at the family and just lying about the situation." Petitioner testified that trial counsel communicated a plea offer by the State of guilty to second degree murder in exchange for a 40–year sentence. Petitioner felt his "only option [was] to go to trial."

On cross-examination, Petitioner acknowledged that he had never been diagnosed with a mental disorder. He testified, "I was grieving at the time so my thoughts were not all in a straight arrow as they were supposed to be." Petitioner testified that he did not recall trial counsel cross-examining Detective Hanson about his expertise in voice recognition. Petitioner also acknowledged that he probably identified himself in the phone calls to the other parties to whom he was speaking. Petitioner did not recall trial counsel filing a motion seeking to prohibit Dr. Thomas from testifying.

Petitioner's trial counsel testified that he had been licensed to practice law in Tennessee since 1994. He estimated that 99 percent of his practice consisted of criminal defense. Trial counsel was appointed to represent Petitioner in 2009. Trial counsel testified that he visited Petitioner "many times in preparation for [Petitioner's] trial." Counsel reviewed discovery with Petitioner, and he discussed with Petitioner the charges against Petitioner and the potential sentences. Petitioner seemed to understand their discussions. Trial counsel testified, "I never got the impression from [Petitioner] that he was in any way mentally disabled or had any kind of psychological problems. Otherwise I would have had him evaluated." Petitioner did not inform trial counsel of any history of mental disorders. Trial counsel testified that he did not perceive any grounds to support a motion to suppress the jail phone call recordings. Regarding the State's plea offer, trial counsel testified:

> Well, I do recall telling [Petitioner] that he was going to get convicted in my estimation. I thought he had a very good chance, a very good chance of being

convicted and that he should take the offer, because otherwise, he was going to be doing a life sentence and he rejected that.

Trial counsel testified that Petitioner consistently maintained pre-trial that he shot the victim in self-defense. Trial counsel advised Petitioner that the State's proof did not support Petitioner's theory of self-defense, and trial counsel explained that Petitioner would have to testify in order to provide proof in support of a jury instruction on self-defense. Trial counsel testified that Petitioner's "testimony at trial came as a complete shock" to him. Trial counsel testified, "it was just a complete about face" from what Petitioner had consistently told trial counsel, and Petitioner's "testimony came out of left field." Trial counsel testified that he reviewed his direct examination questions with Petitioner prior to Petitioner testifying at trial.

Regarding the testimony of the medical examiner, trial counsel testified, "I think I did file a motion about that, but it[']s sort of foggy in my mind to recall what that was about." Trial counsel cross-examined the medical examiner about the trajectory of the bullets in an effort to support Petitioner's theory of self-defense.

Trial counsel did not recall any instances of prosecutorial misconduct during the trial. He testified that he would have objected if there had been prosecutorial misconduct. Trial counsel testified that he did not remember an issue about a juror. He testified that if he had any indication that a juror was biased, he would have either asked the court to strike the juror for cause or he would have stricken the juror peremptorily. Trial counsel testified that he cross-examined Mr. Petty, Mr. Smith, and Mr. Fletcher, and he remembered that one of the witnesses was "a real questionable witness" and was involved in "this real shady business[,]" and one of the witnesses was "a very good witness" and "came off as a very credible witness."

*Short*, 2015 WL 1851943, at **3-4. As previously stated, the post-conviction court denied relief, and the appellate court affirmed.

## IV.    General Standards Governing Review of § 2254 Petitions

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism."

*Woodford v. Garceau*, 538 U.S. 202, 206, 123 S. Ct. 1398, 155 L.Ed.2d 363 (2003) (internal citations and quotation marks omitted).  As the Supreme Court explained, the AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. ——, 134 S. Ct. 10, 15, 187 L.Ed.2d 348 (2013).  The AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id.*

One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of *habeas corpus* is found in 28 U.S .C. § 2254(d).  Under the AEDPA, the court may grant a writ of *habeas corpus* on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

The state court's factual findings are presumed to be correct and they can be contravened only if the petitioner can show by clear and convincing evidence that the state court's factual findings were erroneous.  28 U.S.C. § 2254(e)(1).  The petitioner is entitled to an evidentiary hearing if he alleges sufficient grounds for issuance of the writ, relevant facts are in dispute, and the state courts did not hold a full and fair evidentiary hearing.  *Sawyer v. Hofbauer*, 299 F.3d 605, 610 (6th Cir. 2002).  As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination

was unreasonable-a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933, 167 L.Ed.2d 836, (2007) (citing *Williams*, 529 U.S. at 410). The Supreme Court has held that review under § 2254(d) (1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 131 S. Ct. 1388, 1398, 179 L.Ed.2d 557 (2011).

Further, "[b]efore seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id.* (citation omitted). Claims which are not exhausted are procedurally defaulted and "ordinarily may not be considered by a federal court on habeas review." *Alley v. Bell*, 307 F.3d 380, 388 (6th Cir. 2002).

"In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the lack of review." *Alley,* 307 F.3d at 386. A petitioner can establish cause in two ways. First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Id.* Second, constitutionally ineffective assistance of trial or appellate counsel may constitute cause. *Murray*, 477 U.S. at 488–89. Generally, however, if a petitioner asserts ineffective

assistance of counsel as cause for a default, that ineffective-assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. *Id.* If the ineffective-assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective-assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452–53, 120 S. Ct. 1587, 146 L.Ed.2d 518 (2000).

Until recently, a prisoner could not demonstrate cause for default by claiming that he received ineffective assistance of counsel during state post-conviction proceedings. *See Coleman v. Thompson*, 501 U.S. 722, 752–53, 111 S. Ct. 2546, 115 L.Ed.2d 640 (1992) (holding that attorney error is not cause to excuse a default). The holding in *Coleman* was based on the premise that an individual does not have a constitutional right to counsel in post-conviction proceedings, so the prisoner "must bear the risk of attorney error that results in a procedural default." *Id.* (internal quotations omitted).

Recent changes in the law, however, have enabled petitioners in Tennessee to establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial-review post-conviction proceedings. *See Martinez v. Ryan*, 566 U.S. ——, 132 S. Ct. 1309, 1315, 1320, 182 L.Ed.2d 272 (2012) (creating an exception to *Coleman* where state law prohibits ineffective-assistance claims on direct appeal); *Trevino v. Thaler*, 569 U.S. ——, 133 S.C t. 1911, 1921, 185 L.Ed.2d 1044 (2013) (extending *Martinez* to states with procedural frameworks that make meaningful opportunity to raise ineffective-assistance claim on direct appeal unlikely); *Sutton v.*

*Carpenter*, 745 F.3d 787, 792 (6th Cir. 2014) (holding that *Martinez* and *Trevino* apply in Tennessee).

The Supreme Court's creation in *Martinez* of a narrow exception to the procedural-default bar stemmed from its recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Martinez*, 132 S. Ct. at 1318. In other words, *Martinez* requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *See id.* at 1318–19, 1320. Importantly, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in *Coleman*, 501 U.S. at 750.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170, 102 S. Ct. 1584, 71 L.Ed.2d 816 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause-and-prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court has also recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392, 124 S. Ct.

1847, 158 L.Ed.2d 659 (2004) (citing *Murray*, 477 U.S. at 496).

## V. Analysis

With these principles in mind, the court will turn to the examination of the claims raised in Short's petition for *habeas* relief. The petitioner articulates three separate claims for relief. The respondent argues that all three claims should be dismissed. (Docket No. 28).

### A. Sufficiency of the Evidence

The petitioner contends that the evidence was insufficient to support his convictions. (Docket No. 1 at p. 23). He asserts that there was no evidence of premeditation and that the evidence supports his claim of self-defense. (*Id.*)

On direct appeal to the Tennessee Court of Criminal Appeals, the petitioner argued that the evidence was insufficient to support his convictions because he shot the victim in self-defense. (Docket No. 26-8 at 25-31). This claim therefore is fully exhausted.

In assessing the petitioner's claim, the Tennessee Court of Criminal Appeals applied the governing legal standard for claims of insufficiency of the evidence:

> The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing

17

*State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 208 Tenn. 75, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996).

When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." *Henley v. State*, 960 S.W.2d 572, 578–79 (Tenn. 1997). The Tennessee Supreme Court has stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Bland*, 958 S.W.2d at 659 (citing *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." *Id.* (citing *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982)).

*Short*, 2012 WL 1593174, at *6. The state court concluded that the evidence was sufficient for the

jury to find petitioner guilty:

First degree murder is the "premeditated and intentional killing of another." T.C.A. § 39–13–202(a)(1) (2006). The statute defines "premeditation":

"[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39–13–202(d). A person's actions are "intentional" if it is the person's "conscious objective or desire to ... cause the result." *Id.* § 39–11–106(a)(18).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding

the offense. *State v. Rosa*, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing *State v. Brown*, 836 S.W.2d 530, 539 (Tenn. 1992))."[T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing" may support the existence of premeditation. *Bland*, 958 S.W.2d at 660 (citing Brown, 836 S.W.2d at 541–42; *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)). In addition, the "infliction of multiple wounds" indicate premeditation, *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000) (citing *Brown*, 836 S.W.2d at 542), as do "the shooting of the victim after he had turned to retreat or escape ... and the defendant's failure to render aid to the victim," *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). Finally, the jury may infer premeditation from the defendant's plans related to the murder that occur prior to the killing, from evidence regarding the defendant's motive, and from the nature of the killing. *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995).

Viewed in the light most favorable to the State, the evidence sufficiently established premeditation and intent necessary to convict Short of first degree murder. According to the State's witnesses, the victim appeared to be trying to escape when Short fired repeatedly into the victim's back. Short fired the gun until it was empty, at least eight times, and inflicted multiple wounds on the victim. In addition, the telephone calls from the jail revealed that the killing was the result of a prior arrangement between Short and Bradley. In one telephone call, Short specifically says, "[Joe Joe] the one who set it up." Short further explained that the killing was because the victim had "f—— with [Joe Joe]." Finally, Short conceded at trial that the victim did not have a weapon, demonstrating that Short used a deadly weapon against an unarmed victim.

Most importantly, the eyewitnesses to the shooting testified that the victim appeared to be trying to escape as Short fired repeatedly into the victim's back. Although Short argues, as he did at trial, that the evidence, especially Doctor Thomas's testimony on the trajectory of the bullets, better supported his account of the events, questions of the credibility of witnesses, the weight and value of the evidence, and the inferences to be drawn from the evidence are in the purview of the jury. *Bland*, 958 S.W.2d at 659 (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *Liakas v. State*, 199 Tenn. 298, 286 S.W.2d 856, 859 (Tenn. 1956)). By convicting Short of first degree murder, the jury clearly rejected his account of what happened. We

will not second-guess the jury's determinations on these matters. *Id*. The facts and circumstances surrounding this offense were sufficient to allow the jury to infer that the killing was premeditated and intentional. We conclude, therefore, that the State offered sufficient evidence for any rational trier of fact to find Short guilty of first degree murder beyond a reasonable doubt.

We additionally note that the trial court properly merged Short's convictions of first degree premeditated murder and second degree murder as charged in counts one and two of the indictment. *State v. Kiser*, 284 S.W.3d 227, 234 (Tenn. 2009) (holding "merger of multiple convictions of first degree murder involving a single victim"). However, merger does not eliminate appellate review of the second degree murder. *State v. Adam Clyde Braseel*, No. M2009–00839–CCA–R3–CD, 2010 WL 3609247, at *8 (Tenn. Crim. App. at Nashville, Nov. 18, 2009), *perm. app. denied* (Tenn. Feb. 17, 2011) (noting "[lesser offense] conviction is not extinguished; it simply mergers into the [greater offense] conviction for a single judgment of conviction); *see also State v. Justin Brian Conrad*, No. M2008–01342–CCA–R3–CD, 2009 WL 3103776, at *9 (Tenn. Crim. App., at Nashville, Sept. 29, 2009), *perm. app. denied* (Tenn. Feb. 22, 2010)). Therefore, we will also address the sufficiency of Short's conviction for second degree murder in the event of further review. *Id.*

A person is guilty of the offense of second degree murder, as relevant here, upon committing a knowing killing of another. T.C.A. § 39–13–210(a)(1).

> '[k]nowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

T.C.A. § 39–11–302(b). The proof to support the mens rea element of second degree murder needs to demonstrate beyond a reasonable doubt only that the accused 'knew that his or her actions were reasonably certain to cause the victim's death.' " *See State v. Parker*, 350 S.W.3d 883, 904 (Tenn. 2011) (citing *State v. Brown*, 311 S.W.3d 422, 431–32 (Tenn. 2010)).

We conclude that there was more than sufficient evidence for a reasonable jury to have found a knowing killing of the victim beyond a reasonable doubt. There were three eyewitnesses to the killing, all of whom observed the unarmed victim attempting to escape. Short conceded at trial that he shot the victim, a minimum of eight times, knowing the consequences each time he pulled the trigger. We have also previously concluded that there was sufficient proof of premeditation and intent in this case. Proof that Short intentionally caused the killing sufficed to prove that he knowingly caused the killing. *Id.* § 39–11–301(a)(2) ("When acting knowingly suffices to establish an element, that element is also established if a person acts intentionally."). Short is not entitled to relief.

*Short*, 2012 WL 1593174, at **6-8.

The state court's conclusion that there was sufficient evidence to support the petitioner's conviction was not unreasonable in light of the evidence before the court. Short used a deadly weapon on an unarmed victim who had already turned to retreat or escape.  Up to eight State's witnesses testified that they heard multiple gunshots and saw the petitioner standing behind the victim while the victim was on his knees or that they saw the petitioner shoot the victim in the back while the victim was on his knees. (Docket No. 26-2 at 19, 21-22).  The petitioner incriminated himself by testifying that he pulled his gun on the victim when the victim asked about his charm medallion, acknowledged that his testimony at trial was inconsistent with previous statements, and stated that he knew what he did was wrong. The petitioner made no attempt to provide aid to the victim.  (Docket No. 26-2 at 150-52, 161, 168-72).

While the petitioner argues that "the physical evidence in this case" proves self-defense, he does not address evidence that three bullets were fired into the victim's back that ultimately killed him. (Docket No. 1 at p. 23; *see* Autopsy Report, Ex. 19). The petitioner also does not address the fact that he quit shooting at the unarmed victim only when he was running out of ammunition. (Docket No. 26-2 at 167).

Given the evidence and testimony presented, a rational juror could find that the petitioner was guilty of premeditated murder and second-degree murder beyond a reasonable doubt. The state court's determination was certainly not "objectively unreasonable," and the petitioner has not overcome the high bar to challenging the sufficiency of the evidence in a federal *habeas* proceeding. *See Coleman*, 132 S. Ct. at 2062; *see also Quintero v. Carpenter*, 2014 WL 7139987, at *33 (M.D. Tenn. Dec. 12, 2014)("[E]ven were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable.") (emphasis in original). The petitioner is not entitled to relief on the basis on this claim.

## B. Ineffective Assistance of Counsel Claims

The petitioner claims he received ineffective assistance from his trial counsel.[2] (Docket 1 at 24). Specifically, the petitioner raises four Sub-claims:

> Sub-Claim 2(A): Trial counsel was ineffective for failing to file a motion to suppress the recordings of telephone calls the petitioner made from the jail and to object to Detective Hanson's testimony that he recognized the petitioner's voice because Detective Hanson was not an expert.

> Sub-Claim 2(B): Trial counsel was ineffective for failing to adequately examine State's witnesses Brandon Petty, Tony Smith, and David Fletcher.

> Sub-Claim 2(C): Trial counsel was ineffective for failing to consult with the petitioner prior to trial concerning his testimony.

> Sub-Claim 2(D): (i) Trial counsel was ineffective for failing to inform the jury that the State's witness Rodrickous Hockett perjured himself at the petitioner's trial because the District Attorney threatened to revoke his probation if he did not give false testimony; (ii) trial counsel failed to question the three people who took the

---

[2]Attorney Dwight E. Scott represented the petitioner at trial. (Docket No. 1 at p. 17).

petitioner to the hospital; (iii) counsel advised the petitioner not to accept the State's forty-year plea offer; (iv) trial counsel failed to seek a mental evaluation to determine if the petitioner was competent to stand trial; (v) trial counsel failed to challenge juror Lemons on the grounds that she was a close friend of the victim's family; and (vi) appellate counsel failed to challenge false statements made in the State's direct-appeal brief.

(Docket No. 1 at 24-25).

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant. *See Bell v. Cone*, 535 U.S. 685, 694-95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 686-87 (1984); *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000), *cert. denied*, 531 U.S. 1035 (2000). In assessing performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. Reasonable attorneys may disagree on the appropriate strategy for defending a client. *Bigelow v. Williams,* 367 F.3d 562, 570 (6th Cir. 2004).

The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.

A court hearing an ineffective assistance of counsel claim must consider the totality of the evidence. *Strickland,* 466 U.S. at 695. "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996)(quoting *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992)(*en banc*)). "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.

> **1.    The petitioner procedurally defaulted parts (ii), (iii), and (vi) of Sub-Claim 2(D).**

With regard to Sub-Claim 2(D), the petitioner did not raise part (ii) at all in the state court and, although he raised parts (iii) and (vi) in his state petition for post-conviction relief, he did not raise those claims again in his post-conviction appeal. Those claims are now barred from presentation to the state courts by Tennessee Rule of Appellate Procedure 4, the statute of limitations under Tenn. Code Ann. § 40-30-102(a), and the "one petition" limitation of § 40-30-102(c). As a result, the claims are deemed to be exhausted (because no avenue for raising the claims in state appellate court remains) but procedurally defaulted for the purpose of federal *habeas* review.

As set forth above, in order to obtain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate both "cause" for the procedural default and actual prejudice resulting from the alleged constitutional errors. *Coleman*, 501 U.S. at 750. In this case, the petitioner does not assert cause for the procedural default. Because Sub-Claims 2(D)(ii), (iii) and (iv) are procedurally defaulted and the petitioner cannot overcome the default, those claims are barred from

view in this court and must be dismissed on that basis. *Wogenstahl*, 668 F.3d at 321.

### 2. The petitioner exhausted Sub-Claims 2(A), (B), and (C), and the remaining parts of Sub-Claim 2(D).

The petitioner raised Sub-Claims 2(A), 2(B), and 2(C) and the remaining parts of Sub-Claim 2(D) in state court. (Docket No. 26-15 at 9). These claims are exhausted and properly before the court.

In assessing the petitioner's claims, the Tennessee Court of Criminal Appeals applied the governing legal standard for claims of ineffective assistance of counsel:

> To establish entitlement to post-conviction relief via a claim of ineffective assistance of counsel, the post-conviction petitioner must affirmatively establish first that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases[,]" *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense[,]" *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 80 L.Ed. 2d 674 (1984). In other words, the petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

> When reviewing a claim of ineffective assistance of counsel, we will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

*Short*, 2015 WL 1851943, at *5. The Tennessee Court of Criminal Appeals concluded counsel was not ineffective:

On appeal, Petitioner contends that his trial counsel was ineffective for: (1) failing to strike a juror that Petitioner informed him had a relationship with the family of the victim; (2) failing to cross-examine the State's witnesses about inconsistent statements the witnesses made during the investigation of the case; (3) failing to seek a mental evaluation for Petitioner; (4) failing to object to Detective Hanson's identification of Petitioner's voice in the jail phone call recordings; (5) failing to adequately prepare Petitioner to testify in his own behalf at trial; (6) failing to object to Dr. Thomas' testimony on the basis that she did not perform the autopsy that was the subject of her testimony; and (7) failing to object to testimony by a witness who was allegedly threatened by the prosecutor to revoke the witness's probation.

. . . .

In a written order denying post-conviction relief, the post-conviction court accredited the testimony of trial counsel. Regarding Petitioner's claim that trial counsel failed to object to a biased juror, the court found that "the alternate juror who had to replace a juror [who] was unable to report [on] the second day of trial due to an accident, was questioned as to her knowledge or familiarity with a witness from working with her years ago [and][t]he juror indicated she could be fair." Regarding Petitioner's claim that trial counsel failed to properly cross-examine the eyewitnesses to the offense, the court found that "trial counsel properly questioned and examined the witnesses Petty, Smith, and Fletcher." The court noted that Petitioner did not present at the post-conviction hearing "any alternative questions that should have been asked of the witnesses." The court's order does not address Petitioner's allegation that trial counsel was ineffective for failing to seek a mental evaluation for Petitioner. Regarding Petitioner's allegation that trial counsel was ineffective for failing to object to Detective Hanson's voice identification, the court found that "the caller's voice was properly identified by the Detective who stated he was familiar with the Petitioner's voice." Regarding Petitioner's allegation that trial counsel failed to properly prepare Petitioner to testify, the post-conviction court "accredit[ed] the testimony of trial counsel that he had thoroughly and adequately prepared for trial, including discussions with the Petitioner about his version of events." The court further stated, "[t]rial counsel cannot be faulted for the Petitioner's change in testimony at trial that was a complete shock to him and their theory of defense." The post-conviction court did not make specific findings in its order regarding Petitioner's claim that counsel was ineffective for failing to object to Dr. Thomas' testimony

on the basis that she did not perform the autopsy, or regarding Petitioner's claim that trial counsel was ineffective for failing to object to the testimony of a witness who was allegedly threatened by the prosecutor to revoke the witness's probation.

We conclude that the evidence does not preponderate against the post-conviction court's finding that Petitioner failed to demonstrate that he was prejudiced by counsel's failure to strike a juror who allegedly had a relationship with a family member of the victim. The court implicitly accredited the testimony of trial counsel that he would have asked the court to strike the juror for cause or stricken the juror peremptorily if he had any indication that the juror was biased. We also conclude that the evidence does not preponderate against the post-conviction court's finding that trial counsel properly examined the State's witnesses and that Petitioner had not demonstrated that he was prejudiced by counsel's alleged deficient performance. Counsel testified at the post-conviction hearing that he would have examined the witnesses on any inconsistencies in their statements or testimony. Petitioner did not offer proof of any inconsistent statements or testimony by those witnesses at the post-conviction hearing. Petitioner also presented no proof at the post-conviction hearing that he suffered from any mental or psychological condition. Trial counsel testified at the hearing that Petitioner did not appear in any way to be mentally deficient, and that Petitioner did not inform him that he had any mental health history. Petitioner has failed to establish that counsel's performance was deficient or that he was prejudiced by these alleged deficiencies.

Petitioner claims that counsel was deficient for failing to object to Detective Hanson's testimony that he recognized Petitioner's voice in the jail phone calls because he was not an expert in voice identification. Petitioner asserts that he was prejudiced by the admission of the phone calls into evidence. Trial counsel testified that he did not know of a legal basis on which to seek suppression of the jail phone calls, and he cross-examined the detective about his qualifications. Tennessee Rule of Evidence 901(a) states, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Lay opinion testimony "based upon hearing the voice at any time under circumstances connecting it with the alleged speaker" can be used to authenticate or identify the speaker in a recording. Tenn. R. Evid. 901(b)(5). The post-conviction court found that the detective testified that he was familiar with

Petitioner's voice and properly identified Petitioner's voice. The evidence does not preponderate against the post-conviction court's finding.

We also conclude that the evidence does not preponderate against the post-conviction court's finding that "trial counsel ... thoroughly and adequately prepared for trial, including discussions with the Petitioner about his version of events." The court accredited the testimony of trial counsel and found that "[t]rial counsel cannot be faulted for the Petitioner's change in testimony at trial that was a complete shock to him and their theory of defense." Petitioner has failed to show that trial counsel's performance was deficient in this regard.

We also conclude that counsel's performance was not deficient for failing to object to the testimony of the doctor who had not performed the autopsy. Trial counsel testified that he filed a motion to exclude the testimony of Dr. Thomas on the basis that she did not perform the autopsy. This court has held that it was not error for a trial court to allow a pathologist who did not perform an autopsy to provide expert testimony based in part upon review of an autopsy report prepared by another pathologist. *State v. Thomas Lee Carey, Jr.*, No. M2013–02483–CCA–R3–CD, 2015 WL 1119454, *15 (Tenn. Crim. App., March 10, 2015) (Woodall, J., concurring). Petitioner presented no proof to show that the motion would have been granted if it were filed. Furthermore, trial counsel testified at the post-conviction hearing that he cross-examined Dr. Thomas about the trajectory of the bullets that entered the victim's body, and he believed the medical examiner's testimony supported Petitioner's theory of defense. Petitioner has failed to establish that trial counsel's performance was deficient or that he was prejudiced by his alleged deficiency.

Finally, regarding Petitioner's claim that trial counsel's performance was deficient for failing to object to the testimony of a witness who Petitioner alleges was threatened by the prosecutor to revoke the witness's probation, Petitioner presented no such evidence at the post-conviction hearing. Trial counsel testified that he was not aware of any prosecutorial misconduct, and that if he had been aware of misconduct, he would have objected and raised the issue on direct appeal. Petitioner has not demonstrated that counsel's performance was deficient.

*Short*, 2015 WL 1851943, at **5-6.

In Sub-Claim 2(A), the petitioner alleges that trial counsel was ineffective for failing to file a motion to suppress the recordings of his jail telephone calls and failing to object to Detective Hanson's testimony that he recognized the petitioner's voice on those calls because Detective Hanson was not an expert. (Docket No. 1 at 24). At trial, although counsel objected to the introduction of the recordings on that very basis (Docket No. 26-3 at 26-27), the court found that "the caller's voice was properly identified by the Detective who stated he was familiar with the Petitioner's voice." (Docket No. 26-17 at 5). Further, the petitioner did not establish that he was prejudiced by the recordings being authenticated by Detective Hanson when the petitioner himself conceded that he was one of the participants in the telephone calls. (Docket No. 26-14 at 17-18).[3] Since the petitioner failed to establish both prongs of *Strickland*, the Court of Criminal Appeals was reasonable in rejecting this claim. The claim therefore will be dismissed.

In Sub-Claim 2(B), the petitioner alleges that trial counsel was ineffective for failing to adequately examine State's witnesses Brandon Petty, Tony Smith, and David Fletcher as to what they observed on the night of the shooting and how that related to the petitioner's claim of self-defense. (Docket No. 1 at 24). In his petition, Short maintains that trial counsel should have asked these witnesses if it was possible that petitioner was doing something other than going through the victim's pockets because "this testimony created an influence that the Petitioner was robbing the victim. This alleged robbery was used to support the felony murder charge." (Docket No. 1 at p. 24). According to the petition, "[e]ven though the Petitioner was not convicted of felony murder,

---

[3]In his petition, Short alleges that he was prejudiced by the introduction of the tapes and transcripts of the telephone calls in question "because this was the only evidence presented at trial that established premeditation and intent necessary to convict the petitioner of first degree murder. Counsel should have filed a motion to suppress the tape and transcript of the phone calls because they were not properly authenticated and detective Hanson is not an expert in the field." (Docket No. 1 at p. 24). However, during the petitioner's February 13, 2014 post-conviction hearing, the petitioner admitted that he identified himself as "Nic" during the telephone calls in question and confirmed that he was the "Nic" participating in those telephone calls. (Docket No. 26-14 at 17-18).

he was convicted of a lesser included offense of second degree murder.  If Petitioner's trial counsel had asked this question, the witnesses would have stated 'yes', then counsel would have been able to ask for directed verdict and dismissal of the murder charge." (*Id.*)   The petition further alleges that trial counsel should have asked Petty, Smith, and Fletcher about the distance between the petitioner and the victim when the witnesses allegedly saw the petitioner shoot the victim and whether it was possible that the petitioner was firing shots into the ground when the witnesses allegedly witnessed the petitioner shoot the victim.  (*Id.*)   According to the petitioner, such testimony, had it been elicited, could have supported the petitioner's version of the events and would have been consistent with the testimony of Special Agent Don Caman, a forensic scientist who determined that the gun was not in direct contact with the victim when it was fired but was less than twenty-four inches away at the time.  (*Id.*)

At his post-conviction hearing, the petitioner testified that he believed trial counsel should have (1) asked Petty about his statement to the police on the night of the incident (Docket No. 26-14 at 4-5); (2) asked about the three witnesses's testimony that the petitioner went through the victim's pockets on the night of the shooting (*Id.* at 43) and conflicting testimony that the witnesses could not see the petitioner's hands (*Id.* at 43); and (3) recalled the witnesses specifically to ask about the distance the petitioner was from the victim when the petitioner allegedly shot the victim and from what angle the petitioner allegedly shot the gun and other questions along those lines (*Id.* at 43). In response to the petitioner's testimony, trial counsel testified that one of the witnesses was "a real questionable witness . . . [with] really questionable integrity" (Docket No. 26-14 at 39-40) and one was "a very good witness" who appeared to be "a very credible witness." (*Id.* at 40).  Counsel further testified that if he had found any inconsistencies in the witnesses' testimony, he would have

questioned them; however, he could not recall any such inconsistencies. (*Id.*) The state courts found that the petitioner failed to identify any prejudice he suffered as a result of counsel's alleged deficient examination of these witnesses. Since the burden is on the petitioner to demonstrate prejudice, the court finds that the state courts were not unreasonable in rejecting the petitioner's claim. This claim will be dismissed.

In Sub-Claim 2(C), the petitioner alleges that trial counsel was ineffective for failing to consult with the petitioner prior to trial concerning his testimony. (Docket No. 1 at 25). Short alleges that he needed to explain to the jury that he fired the fun into the ground after the struggle so he wanted to testify. (*Id.*) He claims that his trial counsel should have advised him not to testify at all to avoid the introduction of the petitioner's prior inconsistent statements. (*Id.*) At the post-conviction hearing, however, trial counsel testified about the many communications he had with the petitioner concerning the trial, specifically about preparing the petitioner to testify, and counsel's practice of presenting his clients with a list of anticipated questions. (Docket No. 26-14 at 26-27, 32-33, 36-3). Counsel testified that the petitioner's testimony at trial "'was just a complete about face' from what Petitioner had consistently told trial counsel, and Petitioner's 'testimony came out of left field.'" (Docket No. 26-17 at p. 4). The post-conviction court accredited counsel's testimony "that he was thoroughly and adequately prepared for trial, including discussions with the Petitioner about his version of events," finding that "[t]rial counsel cannot be faulted for the Petitioner's change in testimony at trial that was a complete shock to him and their theory of defense." (Docket No. 26-13 at 66). The court finds that the Court of Criminal Appeals correctly deferred to those credibility findings as there is no "powerful" evidence requiring the court to conclude that the trial court's findings were unreasonable. *See Miller-El v. Cockrell*, 537 U.S. at

339; *Miller-El v. Dretke*, 545 U.S. at 265. This claim will be dismissed.

In part (i) of Sub-Claim 2(D), the petitioner alleges that trial counsel was ineffective for failing to inform the jury that the State's witness Rodrickous Hockett perjured himself at the petitioner's trial because the District Attorney threatened to revoke Hockett's probation if he did not give false testimony. (Docket No. 1 at 25).[4] As the state appellate court noted, the petitioner did not provide any evidence that Hockett perjured himself or that he did so on the threat of a District Attorney. The petitioner had the burden of supporting his ineffective-assistance claim with record evidence. *See Strickland*, 466 U.S. at 687 (placing burden on defendant to show both deficiency and prejudice prongs). Given the absence of any supporting evidence, the petitioner cannot meet his burden for this claim. The Court of Criminal Appeals was reasonable in rejecting this claim, and the claim will be dismissed.

In part (iv) of Sub-Claim 2(D), the petitioner claims that trial counsel was ineffective for failing to seek a mental evaluation to determine if the petitioner was competent to stand trial. (Docket No. 1 at 25). At his post-conviction hearing, the petitioner denied ever being diagnosed with a mental disorder or psychological condition and testified that he was able to communicate and understand his trial attorney and the trial proceedings. (Docket No. 26-14 at 14-17). Trial counsel testified that the petitioner did not tell him of any mental history and that counsel "never got the impression from [petitioner] that he was in any way mentally disabled or had any kind of psychological problems." (Docket No. 26-14 at 28). The state courts were reasonable in concluding

---

[4]The post-conviction court did not make specific findings in its order regarding the petitioner's claim that counsel was ineffective for failing to object to Hockett's testimony. (Docket No. 26-17 at 5). As to this claim, the appellate court found that the petitioner had presented no evidence that the prosecutor threatened to revoke Hockett's probation if he testified one way or the other. Trial counsel testified that he was not aware of any prosecutorial misconduct and, that if he had been aware of misconduct, he would have objected and raised the issue on direct appeal. (*Id.* at 6.)

that the petitioner had failed to present any proof that he suffered from any mental or psychological condition. Since the petitioner failed to establish both prongs of *Strickland*, the Court of Criminal Appeals was reasonable in rejecting this claim. This claim, like the others, will be dismissed.

In part (v) of Sub-Claim 2(D), the petitioner claims that trial counsel was ineffective for failing to strike a juror who allegedly had a relationship with a family member of the victim. (Docket No. 1 at 25). At the post-conviction hearing, counsel testified that he would have asked the court to strike the juror for cause or stricken the juror peremptorily if he had any indication the juror was biased. (Docket No. 26-14 at 39). The post-conviction court implicitly accredited counsel's testimony, and the state Court of Criminal Appeals correctly deferred to the post-conviction court's credibility findings. There is no evidence before the court that this deference was unreasonable. *See Miller-El,* 537 U.S. at 339. Since the petitioner failed to establish both prongs of *Strickland*, the Court of Criminal Appeals was reasonable in rejecting this claim. As with each of his ineffective assistance of counsel claims, this claim fails.

### C.   Confrontation Clause Claim

The petitioner claims his Confrontation Clause rights were violated when he was not allowed to cross-examine the medical examiner who performed the autopsy of the victim. (Docket No. 1 at 25). The respondent contends that this claim is procedurally defaulted and barred from review. (Docket No. 28 at p. 31). The petitioner did not present this claim to the Tennessee Court of Criminal Appeals. However, in his post-conviction appeal, he raised this issue in the context of an ineffective assistance of counsel claim. (Docket No. 26-15 at 10). The Tennessee Court of Criminal Appeals analyzed and rejected the petitioner's Confrontation Clause claim in the context of an ineffective assistance of counsel claim. *Short*, 2015 WL 1851943, at *6.

Because he did not give the state appellate court the opportunity to consider his Confrontation Clause claim as a freestanding claim, the petitioner has not exhausted it. *Rose v. Lundy*, 455 U.S. at 509, 518-20 (1982); *Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008) ("[B]ringing an ineffective assistance claim in state court based on counsel's failure to raise an underlying claim does not preserve the underlying claim for federal habeas review because the two claims are analytically distinct.") (internal quotation marks omitted); *see also Burgess v. Qualls*, No. 2:13-cv-0102, 2014 WL 199841, at *6 (M.D. Tenn. Jan. 17, 2014) (finding petitioner procedurally defaulted his Fourth Amendment claim regarding the search of his home and vehicle even though he raised a state post-conviction ineffective-assistance claim based on trial counsel's failure to challenge the searches). Consistent with this authority, the petitioner's Confrontation Clause claim is now barred from presentation to the state courts by Tennessee Rule of Appellate Procedure 4, the statute of limitations under Tenn. Code Ann. § 40-30-102(a) ,and the "one petition" limitation of § 40-30-102(c). Thus, the claim is procedurally defaulted in this proceeding.

Review in this case, then, is limited to Short's claim that his counsel was ineffective for failing to cross-examine the medical examiner who performed the autopsy of the victim, a claim that <u>was</u> adjudicated in the state courts. If this court were to find that Short's ineffective assistance claim has merit, it could serve as cause to excuse the procedural default of the petitioner's substantive Confrontation Clause claim. *See Davie*, 547 F.3d at 313 (citing *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000)).

In considering the petitioner's claim that counsel was ineffective for failing to object to the testimony of the doctor who had not performed the victim's autopsy, the Tennessee Court of Criminal Appeals recalled trial counsel's testimony at the petitioner's post-conviction hearing that

counsel had filed a motion to exclude the testimony of that doctor, Dr. Sandra Thomas, on the basis that she did not perform the autopsy and that he had cross-examined Dr. Thomas about the trajectory of the bullets that entered the victim's body, and counsel believed the medical examiner's testimony supported the petitioner's theory of defense. (Docket No. 25-17 at 6). The court also cited *State v. Carey, Jr.,* No. M2013-02483-CCA-R3-CD, 2015 WL 1119454, at *15 (Tenn. Crim. App. Mar. 10, 2015), in which the court previously had held that it was not error for a trial court to allow a pathologist who did not perform an autopsy to provide expert testimony based in part upon review of an autopsy report prepared by another pathologist. (*Id.*) The court concluded that the petitioner had failed to establish that trial counsel's performance was deficient or that the petitioner was prejudiced by his alleged deficiency.

The court finds that the state court reasonably rejected the petitioner's ineffective assistance claim that his counsel was ineffective for failing to cross-examine the medical examiner who performed the autopsy of the victim; the finding was not contrary to, and did not involve an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of facts in light of the evidence presented in the state court proceedings. Consequently, this claim must be dismissed and cannot serve as cause to excuse the procedural default of the substantive Confrontation Clause claim.

## VI.     Conclusion

For the reasons set forth herein, Nicholas Short's petition under § 2254 will be denied as to all claims, and this action will be dismissed with prejudice.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a *habeas* petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. §

2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 327, 123 S. Ct. 1029, 154 L.Ed.2d 931 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Because jurists of reason would not disagree with the resolution of these claims , the court will deny a COA as to Claims 1, Sub-Claims 2(A), 2(C), and 2(D), and Claim 3.  However, as to Sub-Claim 2(B), the court finds that jurists of reason possibly could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.  Therefore, a COA will issue as to Sub-Claim 2(B).

An appropriate order will be entered.


Kevin H. Sharp
Chief United States District Judge